1

2

3                    UNITED STATES DISTRICT COURT

4

5                    SOUTHERN DISTRICT OF NEW YORK

6

7  THOMAS A. BANUS, BRENT          ) CASE NO.  09 CV 7128 LAK
   BISHOP, NAVID ALIPOUR, ANIBAL  )
8  DRELICHMAN, GUIDO ALVAREZ      )  **SECOND AMENDED CLASS ACTION**
   and ROBERT GUISTI on behalf of  )
9  themselves and all others similarly )  **COMPLAINT FOR RECESSION OF**
   situated,                       )
10            Plaintiffs,           )  **CONTRACT AND DECLARATORY**
                                   )
11    v.                           )  **RELIEF**
                                   )
12 CITIGROUP GLOBAL MARKETS,       )
   Inc., Does 1-50, Inclusive      )
13                                 )
                                   )
14            Defendants.           )
                                   )
15                                 )
                                   )
16 _____)

17

18        Comes now Plaintiffs THOMAS A. BANUS, BRENT BISHOP, NAVID ALIPOUR,

19  ANIBAL DRELICHMAN, GUIDO ALVAREZ and ROBERT GUISTI on behalf of

20  themselves and all others similarly situated and alleges:

21                          **JURISDICTION/VENUE**

22        1.    This Court has original jurisdiction over this action pursuant to the Class

23  Action Fairness Act, 28 U.S.C. § Sections 1332(d), 1453, and 1711-1715, the named plaintiff

24  BANUS being a resident of the state of Ohio, the named plaintiff BISHOP being a resident

25  of the State of Oklahoma, the named plaintiff ALIPOUR is a resident of the State of

26  California, the named plaintiff DRELICHMAN is a resident of the District of Columbia, the

27  named plaintiff ALVAREZ is a resident of the State of Maryland and the named plaintiff

28  GUISTI is a resident of the State of New York.  Defendant is a Delaware Corporation with

its principle place of business in New York and the amount in controversy for the class far exceeds five million dollars.

2.    Venue is proper in this court because Defendant's principle place of business is within this Judicial District and the contract of employment between Plaintiff and Defendant specifically applies New York law and provides jurisdiction for specific performance of an arbitration provision and generally for enforcement of the parties' rights in the Courts of this State.

3.    The arbitration provisions within the contracts between the parties specifically exclude arbitration of any class action, or putative class action, complaint, leaving the parties free to bring such actions directly in Court.  To the extent that the arbitration provisions of any contract apply, which they do not, then they would be unconscionable unless they allowed for classwide arbitration.

## PARTIES

4.    Upon information and belief, Defendant CITIGROUP GLOBAL MARKETS, Inc., is a Delaware corporation with its principle place of business in New York City, New York.

5.    At all times relevant herein, Plaintiffs were residents of their respective States set forth in paragraph 1 and were employed by Defendant as securities brokers.

6.    The identity of Does 1-50 is unknown at this time, and the complaint will be amended at such time when the identities are known to the parties.

## FACTUAL ALLEGATIONS

7.    During the six year period preceding the commencement of this case, Defendant hired Plaintiffs as securities brokers at various offices of the defendant.  One of the considerations for Defendant's hiring of Plaintiffs was their respective "books of business" or each Plaintiff's client/customer accounts that presumably would follow from each Plaintiff's former employer to their new employer, the defendant.

8.     In consideration of the transportability of this book of business, Defendant fashioned an employment contract with certain minimum levels of expected production (sales or commissions earned from sales and assets under management). Plaintiffs were each assured, both explicitly and implicitly, that Defendant could provide the level of service and security necessary for any security broker to attract and/or retain each Plaintiff's clients.

9.     Defendant paid Plaintiffs based upon production, but at the same time, not only did Defendant set the standards for compensation, but also set the standards for the service and the security provided to each Plaintiff's clients, such latter standards impacted directly the ability of each Plaintiff to attract and/or retain their clients (which causes the production).

10.     Like almost every lateral transferring individual securities broker employed by Defendant, which Plaintiffs estimate to be in excess 500 within the last six years, Defendant offered each Plaintiff a "signing bonus" structured as a forgivable loan over a term of years, in this case $45,675.36 to be forgiven in equal yearly amounts over a term of seven years. If a Plaintiff leaves the Defendant's employ within the term of the note, the unforgiven prorated share of the remaining principle with interest is due and payable immediately, a significant cash reduction to the terminated employee.

11.     A copy of the Defendant's standard form of "Special Compensation Agreement" with Plaintiff BANUS is hereto annexed as exhibit A as if fully set forth here. A copy of the Defendant's standard form of "Promissory Note" with Plaintiff BANUS is hereto annexed as exhibit B and incorporated as if fully set forth herein. All of the Plaintiffs executed these standard form documents although each involved different amounts of money. As can be seen from the face of the exhibits hereto, these are form agreements prepared by Defendant, the only textual variable being the name and social security number of the employee, the amount of money paid as a signing bonus, and the resulting calculation therefrom of the rate of repayment "forgiven" by Defendant per year of employment.

12.     One of the purposes of structuring the signing bonus as a forgivable loan is to ensure that the employee does not resign during the term of the agreement, in this case seven years. On the other hand, the employment agreement explicitly states that the employee remains

an "at will" employee, subject to termination without prior notice by the employer at any time for any reason, or no reason (but, by operation of law, not an unlawful reason). Likewise, the note says it is accelerated upon the termination of each Plaintiff's employment with Defendant regardless of whether it's Defendant's or the employee's decision to terminate the relationship. The consideration for the Promissory Note is the "Special Compensation Agreement."

13. Under New York law, the note and employment agreement constitute a single contract, and all contract defenses apply to the note as well, and the two instruments are to be considered as one. ***Richardson & Morgan Co. v. Gudewill,*** 30 Misc. 818, *; 61 N.Y.S. 1120; 1899 N.Y. Misc. LEXIS 1103 ("The note was given in pursuance of the contract for the exact sum therein stipulated, and, if plaintiff failed to perform its part of the contract, it goes to the failure of the consideration of the note.")

14. Because the Defendant may terminate the employment and accelerate the note at will, with no loss to itself, with or without prior notice, this is an illusory contract, with lack of mutuality and lacking any consideration for the executory portion of what is essentially a unilateral contract. The employee, on the other hand, must pay an accelerated note with accumulated interest if he or she decides to terminate employment with Defendant. The acceleration and imputed interest clauses are unconscionable, and offend public policy. In many states, a penalty for termination of employment is unlawful and unenforceable by statute.

**15.** Within the last six months, Defendant announced it would, and shortly thereafter did, cease its wire house brokerage business, thereby making it impossible for many members of the Plaintiff class to continue as brokers which was both a condition of the yearly forgiveness, and of the acceleration of the note, thereby making it impossible for several of the named Plaintiffs, and many of the class, to perform even though they were ready, willing and able to do so.

## CLASS ACTION ALLEGATIONS

16. Plaintiffs bring this action individually and on behalf of a nationwide class consisting of all securities brokers employed by the defendant within six years of the

commencement of this action who executed a Promissory Note and a Special Compensation Agreement in a form identical and/or substantially similar to Exhibits A and B hereto.

17. Plaintiffs are members of the class having signed such a Promissory Note and Special Compensation Agreement. By way of example, Plaintiff BANUS was employed by Defendant in October 2004 with a signing bonus of $45,675.36 with annual forgiven repayments of $6,525.05 per year for seven years. Plaintiff BANUS terminated his employment in 2006, and Defendant has demanded repayment of the unforgiven portion of the note with interest accrued in the amount of $39,150.31. The other Plaintiffs were employed under the same circumstances and subject to the same procedures and agreements, although possibly in different amounts than Plaintiff BANUS.

18. Upon information and belief, the class consists of over 500 employees. Thus, the class and each subclass is so numerous that joinder of each class member individually is impracticable.

19. The named Plaintiffs' claims are typical of the class claims because all were harmed by the common practices of the Defendant in accelerating the note while Defendant was either totally responsible, or at least partially culpable for the termination of employment, no matter whether the employer or the employee actually gave notice of termination.

20. At all times, the Defendants' locations were operated under uniform written procedures with respect to these practices, a copy of which is attached hereto as exhibits A and B.

21. The named Plaintiffs will fully and adequately represent the interests of the class. The named Plaintiffs have retained counsel that is familiar with employment and class action wage and hour law. The named Plaintiffs have no interests that are contrary to or in conflict with those of the class. The number of members in the class is believed to be several hundred, which makes it impossible to bring all these individuals before the Court. The identities of all class members are readily available from the records of Defendant.

22. A class action is superior to other available means for the efficient adjudication of this lawsuit. Individual litigation could be prohibitively expensive against a large business

entity like the Defendant and would be unduly burdensome to the justice system. Concentrating this litigation in one forum will promote judicial consistency and economy. Notice of this action can be provided to class members since their identities and last known addresses are contained within Defendant's records and files, or in the records of various regulatory agencies which license securities brokers.

23. Issues of law and fact are common and they predominate over any individual questions, specifically: 1) whether the Promissory Note, or any portion thereof (i.e. the acceleration clause) is valid and enforceable; 2) whether Defendant failed to provide the level of service and security necessary for any security broker to attract and/or retain Plaintiffs' clients such as there is a failure of consideration and/or impossibility of performance and/or breach of the duty of good faith and fair dealing and/or whether this was a unilateral contract subject to repudiation, and/or other reasons for excuse of performance by Plaintiffs.

## FIRST CAUSE OF ACTION

### Declaratory Relief

24. Plaintiffs hereby re-allege and incorporate by reference all paragraphs above as though fully set forth herein.

25. The contract, which is exhibit A and B hereto, states it is to be interpreted according to the laws of the State of New York

26. Under New York law, the note and employment agreement constitute a single contract, and all contract defenses apply to the note as well, and the two instruments are to be considered as one. *Richardson & Morgan Co. v. Gudewill,* 30 Misc. 818, *; 61 N.Y.S. 1120; 1899 N.Y. Misc. LEXIS 1103 ("The note was given in pursuance of the contract for the exact sum therein stipulated, and, if plaintiff failed to perform its part of the contract, it goes to the failure of the consideration of the note.")

27. Because the Defendant may terminate the employment and accelerate the note at will, with no loss to itself, with or without prior notice, this is an illusory contract, with lack of mutuality and lacking any consideration for the executory portion of what is essentially a unilateral contract. The employee, on the other hand, must pay an accelerated note with

accumulated interest if he or she decides to terminate employment with Defendant. The acceleration and imputed interest clauses are unconscionable, and offend public policy. In many states, a penalty for termination of employment is unlawful and unenforceable by statute.

28. According to the laws of the State of New York, the contract, which is exhibit A and B hereto, is void and/or voidable, and unenforceable, as to the entire agreements and especially as to any acceleration of payments provisions.

29. The contract is unenforceable because Defendant reserved the right to cancel the agreement at any time without notice. ***Namad v. Salomon, Inc***., 545 N.Y.S.2d 79 (N.Y. 1989), ***Sathe v. Bank of New York,*** 1990 U.S. Dist. LEXIS 5012 (S.D.N.Y. May 2, 1990).

30. The contract is unenforceable, void and voidable because it's unconscionable.

31. By ceasing its wire house brokerage business, Defendant made it impossible for many members of the Plaintiff class to continue as brokers which was both a condition of the yearly forgiveness, and of the acceleration of the note, even though many of the Plaintiffs herein, and members of the class, were ready, willing and able to perform.

32. Under New York law, mutuality of obligation is an essential element of a contract, and without it, the contract is not enforceable. ***Moglia v. Geoghegan***, 403 F.2d 110, 118 (2d Cir. 1968), cert. denied, 394 U.S. 919, 22 L. Ed. 2d 453, 89 S. Ct. 1193 (1969). The contract is unenforceable for lack of mutuality.

33. The contract is unenforceable because of impossibility and frustration of purpose. See, e.g., ***Pettinelli Electric Co. v. Board of Education of the City of New York***, 56 A.D.2d 520, 391 N.Y.S.2d 118, 119 (1st Dep't), aff'd, 43 N.Y.2d 760, 401 N.Y.S.2d 1011, 372 N.E.2d 799 (1977) (citing ***Krell v. Henry***, (1903) 2 KB 740, 749 (C.A.).

34. The contract is unenforceable because the price term is uncertain. Although the Supplemental Compensation Agreement has a price term, that is in addition to the normal compensation which price is not specified. Employees are only concerned with the total compensation, not with the way the employer chooses to break that compensation for book keeping purposes. Since the Supplemental Compensation Agreement provides for cessation upon termination of employment, and the employer can force the employee to terminate

employment by simply not paying him, or lowering his or her pay to an unacceptable level, the price term of the agreement is uncertain.

35.    Defendant had a duty of good faith and fair dealing to run its business in such a manner as to provide the level of service and security necessary for any security broker and the Plaintiffs to attract and/or retain clients, which Defendant breached. When Plaintiffs' clients abandoned Plaintiffs because of the status, procedures and policies of Defendant, Plaintiffs were unable to fulfill their obligation to Defendant and produce the revenue for Defendant that Defendant required. Defendant paid Plaintiffs based upon production, but at the same time, not only did Defendant set the standards for compensation, it also impacted directly the ability of Plaintiffs to attract and/or retain its clients (which causes the production). Defendant made it impossible for Plaintiffs to fulfill their obligations under the contract and remain in Defendant's employ.

36.    The acceleration clause is void because it is a penalty which occurs at the time of leaving rather than the missing of an installment payment. See *Fifty States Management Corp. v. Pioneer Auto Parks, Inc.*, 46 N.Y.2d 573, 415 N.Y.S.2d 800, 389 N.E.2d 113 (1979) and *Walter E. Heller & Co. v. Video Innovations, Inc.*, 730 F.2d 50, 54 (2d Cir. N.Y. 1984).

37.    Wherefore, Plaintiffs pray for a declaration of this Court that the Promissory Note, and all similar such Promissory Notes, which are given for the same exact sum and the exact term and at the same time as the Special Compensation Agreement, and any such similar Special Compensation Agreement, is void and unenforceable, or voidable by either party, or at least that the acceleration provisions thereof is void, and unenforceable.

## SECOND CAUSE OF ACTION
### Petition to Set Aside Arbitration Award

38.    Plaintiffs hereby incorporate all of the allegations contained above as if fully set forth herein.

39.    On August 11, 2009, Plaintiff BANUS appearing specially by his counsel, and in limited appearance only, informed the Financial Industry Regulatory Authority

(FINRA), a private sector non-profit organization that provides arbitration services for disputes between brokers and their employers, among other functions, that a class action complaint had been filed with this Court covering the subject matter of a proposed arbitration between Plaintiff BANUS and Defendant herein, and had previously sent the arbitration panel a copy of the original complaint in this matter.  Plaintiff BANUS' counsel then moved to stay arbitration, or in the alternative to grant a small continuance of the actual submission of the dispute until a file stamped copy of the class action complaint could be forwarded to FINRA.  The panel unreasonably denied this request.  FINRA rule 12204 states the following:

**Class Action Claims**
(a) Class Action Claims may not be arbitrated under the Code.
(b) Any claim that is based upon the same facts and law, and involves the same defendants as in a court-certified class action or a putative class action, or that is ordered by a court for class-wide arbitration at a forum not sponsored by a self-regulatory organization, shall not be arbitrated under the Code, unless the party bringing the claim files with FINRA one of the following:
(1) A copy of the notice filed with the court in which the class action is pending that the party will not participate in the class action or in any recovery that may result from the class action, or has withdrawn from the class according to any conditions set by the court; or
(2) A notice that the party will not participate in the class action or in any recovery that may result from the class action.
(c) The Director will refer to a panel any dispute as to whether a claim is part of a class action, unless a party asks the court hearing the class action to resolve the dispute within 10 days of receiving notice that the Director has decided to refer the dispute to a panel.
(d) A member or associated person may not enforce any arbitration agreement against a member of a certified or putative class action with respect to any claim that is the subject of the certified or putative class action until:
-   The class certification is denied;
-   The class is decertified;
-   The member of the certified or putative class is excluded from the class by the court, or
-   The member of the certified or putative class elects not to participate in the class or withdraws from the class according to conditions set by the court, if any.
This paragraph does not otherwise affect the enforceability of any rights under this Code or any other agreement.

9

7.       At the time of the filing of this complaint, the clerk of the United States Court of the Southern District of New York, unlike many other district court clerks, did not accept electronic filing of the initial pleading (summons and complaint, etc.), in the new cases, although subsequent filing were done electronically.

8.       Plaintiffs' counsel explained the complaint had been sent by an express mail service to the clerk for filing, but no file stamp copy had yet been received.

9.       As soon as a file-stamped copy was received, and before any arbitration decision was issued, Plaintiffs' counsel supplemented the record by sending the conformed copy to FINRA.

10.       Notwithstanding the clear language of the rules, and without jurisdiction to render any award, the arbitration panel issued an award on the exact same issues as presented by this class action complaint between the same parties, a copy of which is attached as exhibit A.

11.       Such award is without jurisdiction, void and unenforceable.

12.       In addition, FINRA rule 12203 states in part that FINRA may pick and choose without any criteria the issues and disputes subject to arbitration and those not.

13.       These two exceptions make the arbitration provision both facially and procedurally unconscionable and any award unenforceable.

14.       For the reasons stated herein, Plaintiff Banus petitions this court to set aside the arbitration award attached hereto as exhibit C, and declare it null and void, and to consider Plaintiff BANUS' case the same as any other named herein.

## THIRD CAUSE OF ACTION

### Damages for Violation of the Truth in Lending Act and All Applicable Analogous State Statues

15.       Plaintiffs hereby incorporate all the allegations contained above as if fully set forth herein.

16.       The Federal Truth in Lending Act, 15 USCA 1601, hereinafter referred to as TILA, was enacted to "…assure a meaningful disclosure of credit terms so that the consumer

will be able to compare more readily the various credit terms available to him and avoid uninformed use of credit and to protect the consumer against inaccurate and unfair billing and credit practices."

17.     The notes to all class members are properly characterized under TILA as "consumer" in nature, since the borrower has no limitations or constraints as to what he can do with the money.  A borrowing broker can take vacations, buy a new car, make home improvements, and pay for a child's education – virtually anything with the loan, and most brokers use the loan proceeds, as the Defendant intended them to be used, for ordinary consumer living expenses during the time it takes for the broker to re-establish his "book of business" after effectuating a change in employment to Defendant from some other brokerage house.

18.     Congress empowered the Federal Revenue to exempt from this regulation, transactions involving a consumer where earnings are greater than $200,000; or has net assets over $1,000,000 so long as at the time of the transaction, "a waiver that is handwritten, signed, and dated by the consumer" is first obtained by the consumer (see 15 USCA 1604 (g) (1)(A) & (B)).  If any Plaintiff and/or any member of the Plaintiff class had earnings and assets in excess in of these amounts, a waiver would have been required at the time the notes were signed.

19.     Upon information and belief, Defendant did not as a matter of practice seek waivers of these requirements at the time a class member signed the notes.  Hence, there is virtually no possibility that the loans evidenced by the notes at issue herein can be exempt from TILA.

20.     At the time that a class member signed a "note", inadequate disclosures concerning credit terms was used by defendant in the document presented to that class member.  Specifically, under the TILA, for each consumer credit transaction other than under an open end credit plan, the creditor shall disclose each of the following items, to the extent applicable:

        (1) In conjunction with the disclosure of the amount financed, a creditor shall

            provide a statement of the consumer's rights to obtain, upon written request, a

written itemization of the amount financed.  The statement shall include spaces

for a "yes" and "no" indication to be initialed by the consumer to indicate

whether the consumer wants a written itemization of the amount financed.

Upon receiving an affirmative indication, the creditor shall provide, at the time

other disclosures are required to be furnished, a written itemization of the

amount financed.  For the purposes of this subparagraph, "itemization of the

amount financed" means a disclosure of the following items, to the extent

applicable:

    a.  The amount that is or will be paid directly to the consumer.

    b.  The amount that is or will be credited to the consumer's account to

       discharge obligations owed to the creditor.

(2) The "finance charge" not itemized using that term.

(3) The finance charge expressed as an "annual percentage rate…"

(4) The sum of the amount financed and the finance charged, which shall be termed

the "total of payments."

(5) Where the credit is secured, a statement that a security interest has been taken in

(A) the property which is purchased as part of the credit transaction, or (B)

property not purchased as part of the credit transaction identified by item or

type.

(6) A statement indicating whether or not the consumer is entitled to a rebate of any

finance charge upon re-financing or prepayment in full pursuant to acceleration

or otherwise, if the obligation involves a pre-computed finance charge.  A

statement indicating whether or not a penalty will be imposed in those same

circumstances if the obligation involves a finance charge computed from time to

time by application of a rate to the unpaid principal balance.

(7) As to the form of the disclosure, the TILA requires all disclosures to be made

"clearly and conspicuously".  In fact, the terms "annual percentage rate" and

"finance charge" must be disclosed more conspicuously than other data.

8.     Each and every of these required disclosures were either not made by Defendant, or were wholly inadequate.  As a matter of uniform practice, none of the disclosures required were presented in writing to a class member at the time the note was signed nor immediately prior thereto.

9.     In addition, the note is unconscionable, vague, without collateral oral evidence and unenforceable.

10.    For example, the forgiveness of the notes is based upon length of service, which is based upon the broker meeting ever changing and undefined production quotas set solely by Defendant.

11.    There is no pro-rata forgiveness for work done in less than one year increments. For example, on a five year note, if a broker works one year and eleven months, he only gets credit for one year.

12.    It is completely unclear as to how one pays off the principal.  One might read that the principal can only be paid after completing each anniversary, yet no credit is given to the consumer for all payments and conditions met prior to that date.  This non-pro-ration of the note does not affect the interest rate actually charged on the note.  This is not clear to the borrower when signing the note and it appears that enforcement efforts have sought recovery for more than the fractional principal and interest sums that were met.  No credit is given for the portion of the year that was worked, relating to any payoff of principal.

13.    Nothing in the Federal TILA precludes a consumer from also recovering under state law for similar violations, and upon information and belief, every state of the United States has similar law preventing such practices as prohibited by TILA.

14.    For example, all members of the class who were employed in California would be protected by Civil Code Section 1799.90 (a)(4).  Consequently, TILA laws will also apply to this portion of the class as well.

15.    Most, if not all, community property states prohibit employees from encumbering future earnings, which are community property if the employee is married, without the express written consent of the spouse.  For example, California Labor Code

Section 300 requires that any assignment of wages be consented to by the spouse. Many class members are married and live in community property states like California. The note contains language that allows the employer to withhold all amounts payable from wages owed but does not require (or contain) a signature by the spouse of the employee. Defendant knows, or should have known which employees are married, since defendant requires this information for its tax and employee benefit administration.

16.     The loans also include language that give defendant the right to, without notice withhold from any and all amounts payable, due or held in an account for the class member, as  compensation or otherwise, amount(s) equal to any payment(s) in default of the note and to apply such withheld amounts to the indebtedness of the note.

17.     The named Plaintiffs and most class members have or had brokerage accounts with Defendant as a condition of employment. The fact that Defendant maintains a brokerage account for each class member, and the apparent language in the notes, gives Defendant an illegal security interest as defined by Civil Code Section 1799.103 because it does not specifically identify the investment property as required.

18.     TILA allows the consumer the following remedies:

    a.   Recession;

    b.   Statutory damages:  The law provides a minimum of $100 floor and a $1,000 ceiling per individual.  The statutory damages are measured as double the finance charge.

    c.   Award of actual damages.  Due to the nature of Defendant not crediting brokers with payment of principal and interest between year, brokers who have charged and paid these amounts have been actually damaged, by virtue of their overpayment.

    d.   Interest.

    e.   Attorney fees.

19.     Wherefore, Plaintiffs pray for statutory damages, the option to voluntarily

rescind the note, without interest but with credit for all amounts paid, including imputed interest thereon, and actual damages, interest and attorneys fees.

## FOURTH CAUSE OF ACTION

### Recision

20.    Plaintiffs re-allege and incorporate by reference all paragraphs above as though fully set forth herein.

21.    Plaintiffs had bargained for a national stock brokerage firm with a stellar reputation and sound financial policies so each Plaintiff's clients would feel secure in placing their money with each Plaintiff under the umbrella of such an organization. But as can be seen from the value of Defendant's stock today, Defendant was unstable, mismanaged, and not a secure place for each Plaintiff's clients to place their money. Plaintiffs terminated employment because Defendant did not manage its business in such a manner as to provide the level of service and security necessary for Plaintiffs or any security broker to attract and/or retain clients.  Plaintiffs owed a legal duty to advise their clients of the fact that Defendant was almost insolvent, or not prudently managed. On the other hand, fulfillment of this duty would further harm Defendant by the loss of clients who would not stay at such a brokerage firm as that which Defendant had become.

22.    Defendant rescinded the agreement by failing to remain solvent, by mismanaging its company to the point that it could no longer provide the security required by each Plaintiff's clients, and by penalizing Plaintiffs with reduced compensation because of its own failures.

23.    Wherefore, Plaintiffs pray that that the Promissory Note, and all similar such Promissory Notes, which are given for the same exact sum and the exact term and at the same time as the Special Compensation Agreement, and any such similar Special Compensation Agreement, are deemed rescinded, or at least the acceleration clause therefore is so deemed.

## PRAYER FOR RELIEF

24.  Plaintiffs, individually and on behalf of all others similarly situated, pray for relief as follows:

a.  An Order of this Court that the Promissory Note, and all similar such Promissory Notes, which are given for the same exact sum and the exact term and at the same time as the Special Compensation Agreement, and any such similar Special Compensation Agreement, is void and unenforceable, or voidable by either party, or at least that the acceleration provisions thereof is void, and unenforceable.

b.  An Order of this Court that the Promissory Note, and all similar such Promissory Notes, which are given for the same exact sum and the exact term and at the same time as the Special Compensation Agreement, and any such similar Special Compensation Agreement, are deemed rescinded, or at least the acceleration clause therefore is so deemed.; and

c.  Further orders directing such relief as this court may deem just and proper.

Dated this 25th day of November, 2009.

LEON GREENBERG , Esq.

By:   LEON GREENBERG
      Attorney for Plaintiffs
      633 South 4th Street – Suite 4
      Las Vegas, Nevada 89101
      (702) 383-6085

Pro Hoc Vice Pending:

THIERMAN LAW FIRM

By:   /s/Mark R. Thierman
      MARK R. THIERMAN
      NV#8285 CAL#72913

**THIERMAN LAW FIRM, P.C.**
7287 Lakeside Drive
Reno, Nevada 89511
Tel: (775) 284-1500
Fax: (775) 703-5027

**EXHIBIT A**
**PROMISSORY NOTE DATED OCTOBER 21, 2004**

# Promissory Note

| (A) Name of Borrower | (B) Amount of Loan (Principal Sum) |
|---|---|
| Thomas A. Banus | 45,675.36 |

1. Indebtedness. _Thomas A. Banus_____ ("Borrower") hereby affirms and acknowledges his/her indebtedness to Citigroup Global Markets Holdings Inc. ("Holdings") in the amount of $_45,675.36___ .

2. Payment. In connection with the aforementioned, Borrower promises to pay to the order of Holdings the sum of $_45,675.36___, payable in seven equal annual installments of $_6,525.05___, commencing on the first anniversary of the date on which Borrower executes this Promissory Note ("Note") as indicated below. For the length of time that the Borrower is placed on an approved leave of absence by Holdings, or its affiliates, the Borrower's anniversary date shall be extended by the length of the leave of absence. The Borrower authorizes and directs Holdings, or its affiliates, to deduct such installment payment(s) from any securities account that Borrower maintains with Holdings, or its affiliates, or from any salary, commission or other compensation payments owed to Borrower from Holdings, or its affiliates. If this is not sufficient, then the Employee shall pay the outstanding amount by check.

3. Imputed Interest Income. The Borrower acknowledges that the loan evidenced by this Note is interest free for as long as there is no default in payment. Holdings, or its affiliates, is required to annually report in the Borrower's gross income the value of the forgone interest at the applicable federal rate. As a result, FICA is due on this income and the Borrower authorizes and directs Holdings, or its affiliate, to withhold this FICA amount from the Borrower's salary, commissions or other compensation payments. If this is not sufficient, then the Borrower authorizes this FICA amount to be deducted from the Borrower's securities account.

4. Acceleration of Payment. Upon the happening of any of the following events, the Borrower shall be deemed to be in Default on the Note and any outstanding balance due on this Note will become immediately due and payable, together with interest accruing from the date of termination, at the rate of prime plus 6% per annum. Default shall mean where the Borrower's employment with Holdings, or any subsidiary or affiliate thereof, comes to an end for any reason or no reason, is adjudicated as bankrupt, makes an assignment for the benefit of creditors, or files a petition for relief under the bankruptcy laws.

5. Registration/Representations. The Borrower understands and agrees that the loan evidenced by the Note is expressly conditioned upon the Borrower's prompt registration with all applicable regulatory bodies and the accuracy of all information which the Borrower has provided including that relating to the Borrower's historical commission production and regulatory and disciplinary background.

6. Cost of Collection. The Borrower promises to pay Holdings for all expenses it incurs, including attorney's fees, in connection with the collection of any outstanding indebtedness due under this Note or to enforce any provision hereunder.

7. Remedies. Holdings or its affiliates shall have the right, upon default, without notice, to withhold any monies, commissions, securities, commodities, or other properties of the Borrower which may at any time be in the possession of Holdings or its affiliates, and to apply such monies, etc. to satisfy the indebtedness due under this Note. The Borrower authorizes and consents to such remedies.

8. Notices. The Borrower, Borrower's heirs, successors, assigns and personal representatives hereby waive presentment, demand for payment, notice of dishonor or protest and any and all other notices and demands in connection with the delivery, performance, default or enforcement of this Note.

9. Dispute Resolution. Subject to Paragraph 13, the Borrower hereby agrees that any controversy arising out of or relating to this Note, or a default hereunder shall be submitted to and settled by arbitration pursuant to the constitution, by-laws, rules and regulations then in effect of the New York Stock Exchange, Inc. or the National Association of Securities Dealers, Inc.

10. Successors and Assigns. This Note shall inure to the benefit of Holdings, its affiliates, and any successors in interest to the business of Holdings, whether through merger, acquisition, sale or other transfer. Holdings retains the right to assign its rights, title and interest in this Note to any of its affiliates.

11. Modifications. The Borrower acknowledges that this Note contains the entire agreement between Holdings and the Borrower with respect to the loan and the repayment thereof, and the Borrower is not relying on any other statements, representations or provisions not contained herein. This Note may not be altered or modified in any way unless it is in writing and signed by the parties hereto.

12. Governing Law. This Note and the loan evidenced thereby shall be governed by the laws of the State of New York.

13. Jurisdiction. The Borrower consents to the jurisdiction of the courts of the State of New York for the purpose of any action to compel arbitration in accordance with the terms of this Note or to confirm or enter judgment upon any arbitration award.

TO BE SIGNED IN THE PRESENCE OF A NOTARY PUBLIC

Signature of the Borrower

Date: 10/21/04

Social Security Number: 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

P&L#: 00224

State of _Ohio_ } ss
County of _Cuyahoga_
Subscribed and sworn to before me on _October_ _21_, 20 _04_

Notary Public



TAMIKA S. MOON, Notary Public
State of Ohio, Cuyahoga County
My Commission Expires Dec. 13, 2006

**EXHIBIT B**
**SPECIAL COMPENSATION AGREEMENT**

# Special Compensation Agreement

**SMITH BARNEY**
citigroup

| (A) Name of Borrower | (B) Amount of Loan (Principal Sum) |
|---|---|
| Thomas A. Banus | 45,675.36 |

This Special Compensation Agreement (the "Agreement"), entered into on this **21** day of **October**, 20 **04** between **Thomas A. Banus** (the "Employee") and Citigroup Global Markets Inc. ("SB" or "Smith Barney").

1. **Special Compensation.** Employee shall be paid special compensation in the amount of $ **45,675.36**, less appropriate payroll taxes and withholdings, in seven equal annual installments commencing on the first anniversary of the date on which Employee executes this Agreement. For the length of time that the Employee is placed on an approved leave of absence by SB, or its affiliate, the Employee's anniversary date shall be extended by the length of the leave of absence. In all cases, such special compensation shall not be remitted directly to the Employee, but shall be applied to any obligation the Employee has with Smith Barney, or any affiliate. The Employee acknowledges that the annual special compensation payment is taxable gross income to the Employee. As a result, payroll taxes are due on this payment and the Employee authorizes and directs SB, or its affiliate, to deduct such payroll taxes from any securities account that Employee maintains with SB, or its affiliates, or from any salary, commission or other compensation payments owed to Employee from SB, or its affiliates. If this is not sufficient, then the Employee shall pay the outstanding amount by check.

2. **Registration/Representations.** The Employee understands and agrees that this Agreement is expressly conditioned upon the Employee's prompt registration with all applicable regulatory bodies and the accuracy of all information which the Employee has provided including that relating to the Employee's historical commission production and regulatory and disciplinary background.

3. **Confidentiality of Records/Non Solicit.** Employee understands that any client record and information, including names, addresses, telephone numbers and account information, whether generated by SB or Employee, are confidential and proprietary information and important business assets of SB. This information is extremely valuable to SB is not generally known outside SB, is unique and cannot be easily duplicated or acquired. Employee agrees to use such information only in the normal course of Employee' employment with SB and will not remove any client-related records from SB's premises, whether in original or copied form. Employee further agrees that for a period of one year following Employee's termination of employment from SB, for any or no reason, Employee will not solicit or contact any clients that Employee learned of during employment with SB, other than those clients which Employee may have brought with Employee and for whom the Employee was the broker of record at

Employee's prior employer. In the event Employee breaches this paragraph, Employee agrees that SB will be entitled to injunctive relief. Employee recognizes that SB will suffer immediate and irreparable harm and that money damages will not be adequate to compensate SB or to protect and preserve the status quo. Therefore, Employee CONSENTS TO THE ISSUANCE OF A TEMPORARY RESTRAINING ("TRO") or A PRELIMINARY or PERMANENT INJUNCTION ("PI") ordering: (a) that Employee return all records in any form that they exist; (b) that Employee be restrained from using or disclosing any information contained in such records; (c) that Employee be restrained, for a period of one year, from soliciting or contacting any clients that Employee learned of during the employment with SB.

4. **Dispute Resolution.** Subject to Paragraph 9, any controversy arising out of or relating to this Agreement shall be submitted to and settled by arbitration pursuant to the constitution, by-laws, rules and regulations then in effect of the New York Stock Exchange, Inc. or the National Association of Securities Dealers, Inc.

5. **At-Will.** This Agreement does not constitute a contract of employment for any definite period of time. The Employee's employment with SB is on an "at-will" basis which means that the employment relationship can be terminated at any time for no reason or any reason not otherwise prohibited by law.

6. **Successors.** This Agreement shall inure to the benefit of SB, its affiliates, and any successors in interest to the business of SB, whether through merger, acquisition, sale or other transfer.

7. **Modifications.** This Agreement contains the entire agreement between the Employee and SB with respect to any special compensation, and the Employee is not relying on any other statements, representations or provisions not contained herein. This Agreement may not be altered or modified in any way unless it is in writing and signed by the parties hereto.

8. **Governing Law.** This Agreement shall be governed by the laws of the State of New York.

9. **Jurisdiction.** The Employee consents to the jurisdiction of the courts of the State of New York for the purpose of any action to compel arbitration in accordance with the terms of this Agreement or to confirm or enter judgment upon any arbitration award.

10. **Termination of Agreement.** This Agreement shall terminate and the Employee's right to Special Compensation provided for in Paragraph 1 under this Agreement shall cease upon the date of Employee's last day of employment, due to any season or no reason.

| TO BE SIGNED IN THE PRESENCE OF A NOTARY PUBLIC | Employee Signature | Date 10/21/04 |
| | Branch Manager Signature | Date 10/21/04 |

State of **Ohio**
County of **Cuyahoga** } ss
Subscribed and sworn to before me on **October 21, 2004**

Notary Public

Smith Barney is a division and service mark of Citigroup Global Markets Inc.
**TAMIKA S. MOON, Notary Public**
State of Ohio, Cuyahoga County

EXHIBIT "C"

## AWARD
## FINRA Dispute Resolution

In the Matter of the Arbitration Between:

Name of Claimant

Citigroup Global Markets, Inc.

vs.

Name of Respondent

Thomas Anthony Banus

Case Number: 08-00466
Hearing Site: Cleveland, Ohio

## NATURE OF THE DISPUTE

Member vs. Associated Person

## REPRESENTATION OF PARTIES

Citigroup Global Markets, Inc. ("Claimant" or "Citigroup") was represented by Gregory B. Simon, Esq., Kane & Fischer, Ltd., Chicago, Illinois.

Thomas Anthony Banus ("Respondent" or "Banus") was represented by Douglas A. Kutsko & Associates Co., LPA, Avon Lake, Ohio, until on or about March 16, 2009. On August 11, 2009, Mark R. Thierman, Esq., Reno, Nevada, filed Notice of Appearance on behalf of Respondent.

## CASE INFORMATION

The Statement of Claim was filed on or about February 18, 2008. The Submission Agreement of Claimant, Citigroup Global Markets, Inc., was signed on or about August 27, 2008.

The Statement of Answer was filed by Respondent, Thomas Anthony Banus, on or about May 2, 2008. The Submission Agreement of Respondent, Thomas Anthony Banus, was signed on or about May 14, 2008.

## CASE SUMMARY

Claimant asserted the following cause of action: breach of promissory note. Claimant alleged that pursuant to the terms of the promissory note (the "Note"), upon Respondent's resignation from Citigroup, the unpaid balance of the Note would become immediately due and payable, together with interest accruing from the date of termination. Respondent's

resignation occurred on September 12, 2006 and the remaining principle balance due under the note was $39,150.31.

Unless specifically admitted in his Answer, Respondent denied the allegations made in the Statement of Claim and asserted affirmative defenses including the following: Claimant failed to state a claim upon which relief can be granted; the claims are barred as there are no damages; the contract at issue is an adhesion contract; the contract at issue lacks consideration; Claimant failed to mitigate any ongoing lost interest by not immediately offsetting the alleged debt with monies owed to Respondent per the terms of the agreement; and Claimant failed to mitigate and is not entitled to costs of litigation and/or attorneys' fees as it could have immediately offset the alleged debt with monies owed to the Respondent per the terms of the agreement.

## RELIEF REQUESTED

Claimant requested an award in the amount of:

| | |
|---|---|
| Actual/Compensatory Damages | $39,150.31 |
| Interest | Unspecified |
| Attorneys' Fees | Unspecified |
| Other Costs | Unspecified |
| Other Monetary Relief | Unspecified |

At the hearing, Claimant requested an award in the amount of:

| | |
|---|---|
| Actual/Compensatory Damages | $39,150.31 |
| Interest | $13,744.58 |
| Attorneys' Fees | $19,054.50 |
| Other Costs | $ 5,211.23 |

Respondent requested that the claims asserted against him be denied in their entirety and that he be awarded his costs and attorneys' fees.

## OTHER ISSUES CONSIDERED & DECIDED

The Panel acknowledges that they have each read the pleadings and other materials filed by the parties.

Respondent's counsel appeared by telephone at the final hearing. With his opening arguments, Mr. Thierman presented a Motion to Stay. The motion was denied by the Panel.

The parties have agreed that the Award in this matter may be executed in counterpart copies or that a handwritten, signed Award may be entered.

## AWARD

After considering the pleadings, the testimony, and the evidence presented at the hearing, the Panel has decided in full and final resolution of the issues submitted for determination as follows:

1.) Respondent, Thomas Anthony Banus, is liable for and shall pay to Claimant, Citigroup Global Markets, Inc., the sum of $39,150.31 in compensatory damages;

2.) Respondent, Thomas Anthony Banus, is liable for and shall pay to Claimant, Citigroup Global Markets, Inc., pre-award interest on the above-stated sum of $6,872.29;

3.) Other than Forum Fees which are specified below, the parties shall each bear their own costs and expenses incurred in this matter; and

4.) Any relief not specifically enumerated, including attorneys' fees, is hereby denied with prejudice.

## FEES

Pursuant to the Code, the following fees are assessed:

### Filing Fees

FINRA Dispute Resolution will retain the non-refundable filing fee* for each claim:

Initial Claim filing fee                                      = $ 1,450.00

*The filing fee is made up of a non-refundable and a refundable portion.

### Member Fees

Member fees are assessed to each member firm that is a party in these proceedings or to the member firm that employed the associated person at the time of the events giving rise to the dispute. Accordingly, as a party, Citigroup Global Markets, Inc. is assessed the following:

Member surcharge                                          = $   875.00

Pre-hearing process fee                                            = $    750.00
Hearing process fee                                                = $  1,000.00

## Adjournment Fees

Adjournments granted during these proceedings:

March 17-19, 2009, adjournment requested by Banus       = $    600.00

## Three-Day Cancellation Fees

Fees apply when a hearing on the merits is postponed or settled within three business days before the start of a scheduled hearing session:

March 17-19, 2009, adjournment requested by Banus       = $    300.00

## Hearing Session Fees and Assessments

The Panel has assessed hearing session fees for each hearing session conducted. A session is any meeting between the parties and the arbitrators, including a pre-hearing conference with the arbitrators, that lasts four (4) hours or less. Fees associated with these proceedings are:

One (1) Pre-hearing session with Panel x $600.00                   = $    600.00
Pre-hearing conference:    July 8, 2008        1 session

Two (2) Hearing sessions x $600.00                                 = $  1,200.00
Hearing Date:_____August 11, 2009____2 sessions_____
Total Hearing Session Fees                                         = $  1,800.00

The Panel has assessed $900.00 of the hearing session fees to Citigroup Global Markets, Inc.

The Panel has assessed $900.00 of the hearing session fees to Thomas Anthony Banus.

All balances are payable to FINRA Dispute Resolution and are due upon receipt.

FINRA Dispute Resolution
Arbitration No. 08-00466
Award     Page 5 of 5

## ARBITRATION PANEL

Peter L. Pointer - Non-Public Arbitrator, Presiding Chair
Ralph L. Corton, Jr. CFA - Non-Public Arbitrator
Robert G. Conway - Non-Public Arbitrator

Concurring Arbitrators' Signatures:

/s/ Peter L. Pointer                             August 12, 2009
Peter L. Pointer                                  Signature Date
Non-Public Arbitrator, Presiding Chair

/s/ Ralph L. Corton, Jr. CFA               August 12, 2009
Ralph L. Corton, Jr. CFA                      Signature Date
Non-Public Arbitrator

/s/ Robert G. Conway                   August 12, 2009
Robert G. Conway                          Signature Date
Non-Public Arbitrator

August 12, 2009
Date of Service   (For FINRA office use only)

FINRA Dispute Resolution
Arbitration No. 08-00468
Award     Page 5 of 5

## ARBITRATION PANEL

Peter L. Pointer - Non-Public Arbitrator, Presiding Chair
Ralph L. Corton, Jr. CFA - Non-Public Arbitrator
Robert G. Conway - Non-Public Arbitrator

Concurring Arbitrators' Signatures:

_Peter L. Pointer_

Peter L. Pointer
Non-Public Arbitrator, Presiding Chair

$8-12-09$
Signature Date

Ralph L. Corton, Jr. CFA
Non-Public Arbitrator

Signature Date

Robert G. Conway
Non-Public Arbitrator

Signature Date

Date of Service  (For FINRA office use only)

FINRA Dispute Resolution
Arbitration No. 08-00466
Award Page 5 of 5

## ARBITRATION PANEL

Peter L. Pointer - Non-Public Arbitrator, Presiding Chair
Ralph L. Corton, Jr. CFA - Non-Public Arbitrator
Robert G. Conway - Non-Public Arbitrator

Concurring Arbitrators' Signatures:

Peter L. Pointer
Non-Public Arbitrator, Presiding Chair

_____
Signature Date

Ralph L. Corton, Jr./CFA
Non-Public Arbitrator

8/12/05
Signature Date

Robert G. Conway
Non-Public Arbitrator

_____
Signature Date

Date of Service  (For FINRA office use only)

FINRA Dispute Resolution
Arbitration No. 08-00466
Award     Page 5 of 5

## ARBITRATION PANEL

Peter L. Pointer - Non-Public Arbitrator, Presiding Chair
Ralph L. Corton, Jr. CFA - Non-Public Arbitrator
Robert G. Conway - Non-Public Arbitrator

Concurring Arbitrators' Signatures:

_____

Peter L. Pointer
Non-Public Arbitrator, Presiding Chair

Signature Date

_____

Ralph L. Corton, Jr. CFA
Non-Public Arbitrator

Signature Date

Robert G. Conway
Non-Public Arbitrator

8 - 12 - 09
Signature Date

_____

Date of Service  (For FINRA office use only)