**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| THOMAS A. BANUS, BRENT BISHOP, NAVID ALIPOUR, ANIBAL DRELICHMAN, GUIDO ALVAREZ, and ROBERT GIUSTI, on behalf of themselves and all other similarly situated,<br><br>        Plaintiffs,<br><br>    -against-<br><br>CITIGROUP GLOBAL MARKETS, Inc., Does 1-50, Inclusive,<br><br>        Defendant. | CASE NO. 09-CV-7128<br><br>*Electronically Filed* |

# MEMORANDUM OF LAW IN OPPOSITION TO MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT

THIERMAN LAW FIRM
Mark R. Thierman
7287 Lakeside Drive
Reno, NV 89511
(775) 284-1500
Fax: (775) 703-5027

Leon Greenberg, Esq.
633 South 4th Street, Suite 4
Las Vegas, NV 89101
(702-383-6085

Attorneys for Plaintiff

0

# TABLE OF CONTENTS

PRELIMINARY STATEMENT...........................................................................1

STATEMENT OF FACTS..............................................................................1

I.     THE ARBITRATION PANEL VIOLATED SECTION 10(A)3 OF THE
FEDERAL ARBITRATION ACT BY FAILING TO GRANT A
REASONABLE CONTINUANCE TO ALLOW THIS MOTION TO
BE DECIDED.............................................................................5

II.    THE FINRA ARBITRATION IS UNENFORCEABLE UNDER THE
SECOND CIRCUIT CASE OF *ITALIAN COLORS REST. v. AM.
EXPRESS TRAVEL RELATED SERVS. CO.* (IN RE AM. EXPRESS
MERCHANTS' LITIG.), 544 F. 3D 300 (2D CIR. N.Y. 2009) BECAUSE
FINRA RULE 13204 IS A CLASS ACTION WAIVER PROVISION............9

III.   UNDER NEW YORK'S EMPLOYEE CHOICE DOCTRINE,
DEFENDANT'S NON-COMPETITION AGREEMENT IS
UNCONSCIONABLE AND UNENFORCEABLE COVENANT NOT
TO COMPETE...........................................................................14

IV.   THE PROMISSORY NOTE WAS A CONTRACT OF ADHESION AND
UNCONSCIONABLE AS A MATTER OF LAW...................................18

V.    THE ACCELERATION CLAUSE IS INVALID BECAUSE OF
FRUSTRATION OF PURPOSE.....................................................21

CONCLUSION.........................................................................................24

i

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Accord Kristian v. Comcast Corp.,*
    446 F.3d 25, 55 (1 Cir. 2006)...............................................................12

*Alpert's Newspaper Delivering Inc. v. New York Times Co.,*
    8756 F. 2d 266, 270 (2d Cir. 1989).....................................................8, 9

*American Institute of Chemical Engineers v. Reber-Friel Co.,*
    682 F.2d 382, 387 (2d Cir. 1982)..........................................................16

*A.N. Deringer, Inc. v. Strough,*
    103 F.3d 243 (2d Cir. 1996).................................................................16

*AT&T Techs. V. Communications Workers of Am.,*
    475 U.S. 643 at 651-652 (U.S. 1986)....................................................12

*Atkinson v. Sinclair Refining Co.,*
    370 U.S. 238, 241-243 (1962)..............................................................12

*Brennan v. Bally Total Fitness,*
    198 F.Supp. 2d 377, 3825 (S.D.N.Y. 2002)......................................19, 20

*Buckeye Check Cashing, Inc. v. Cardegna,*
    546 U.S. 440, 444 (2006).....................................................................12

*Dumais v. Am. Golf Corp.,*
    299 F.3d 1216 (10th Cir. 2002).............................................................13

*First Options v. Kaplan,*
    514 U.S. 938 at 943-946 (U.S. 1995)....................................................12

*Gibson v. Neighborhood Health Clinics, Inc.,*
    121 F.3d 1126 (7th Cir. 1997)...............................................................13

*GFI Brokers, LLC v. Santana,*
    2008 U.S. Dist. LEXIS 59219 (S.D.N.Y. Aug. 6, 2008).........................16

*Howsam v. Dean Witter Reynolds, Inc.*
    537 U.S. 79, 84 (2002)…………………………………………………………….....11

*In re Stock Exchs. Options Trading Antitrust Litig.,*
    2005 U.S. Dist. LEXIS 13734 (S.D.N.Y. 2005)…………………………………………….21

*Italian Colors Rest. v. AM. Express Travel Related Servs. Co. (In re: Am. Express Merchant's Litig.)*
    554 F. 3d 300 (2d Cir. N.Y. 2009)…………………………………………………..9, 10, 11

*Jenkins v. First Am. Cash Advance of Georgia, LLC,*
    400 F.3d 868, 877 (11 Cir. 2005)…………………………………………………………..12

*John Wiley & Sons, Inc. v. Livingston,*
    376 U.S. 543, 546-547 (1964)…………………………………………………………...12

*Kaneff v. Del. Title Loans, Inc.,*
    587 F.3d 616 (3d Cir. 2009)…………………………………………………………..13

*Klos v. Lotnicze,*
    133 F.3d 164, 168 (2d Cir. 1997)…………………………………………………………19

*Lucente v. IBM,*
    310 F.3d 243 at 254 (2d Cir. N.Y. 2002)…………………………………………………...15

*Morris v. Schroder Capital Mgmt. Int'l,*
    445 F.3d 525 (2d Cir., 2006)…………………………………………………………..17

*Prima Painting Corp. v. Flood & Conklin Mfg. Co.,*
    388 U.S. 395, 403-404 (1967)…………………………………………………………...12

*Ticor Title Ins. Co. v. Cohen ,*
    173 F.3d 63, 69-70 (2d Cir. 1999)…………………………………………………………16

*Ting v. AT&T,*
    319 F.3d 1126, 1149-51 (9th Cir. 2003)…………………………………………...………13

*Triarch Indus. V. Crabtree,*
    158 S.W.3d at 775………………………………………………………………….…13

*Walter E. Heller & Co. v. Video Innovations, Inc.,*
    730 F.2d 50, 54 (2d Cir. N.Y. 1984)............................................................15

*Williams v. Walker-Thomas Furniture Co.,*
    350 F.2d 445, 449.....................................................................................18, 21

*Wright v. SFX Entertainment, Inc.,*
    2001 U.S. Dist. LEXIS 1000, 2001 WL 103433, at 3*.....................................19

## STATE CASES

*Alternative Systems, Inc. v. Carey,*
    67 Cal.App.4th 1034, 1040-1041, 79 Cal. Rptr. 2d 567 (1998)..............................13

*BDO Seidman v. Hirshberg,*
    93 N.Y.2d 382, 712 N.E.2d 1220, 1222-23, 690 N.Y.S.2d 854 (N.Y. 1999)............15

*Blake v. Biscardi,*
    62 A.D.2d 975, 403 N.Y.S.2d 544, 546-47 (2d Dept. 1978)..................................21

*Brower v. Gateway,*
    2000, 246 A.D.2d 246, 676 N.Y.S.2d 569, 273 (1st Dep't 1998)............................20

*City of New York, Respondent v. Long Island Airports Limousine Service Corporation, et al.,*
    96 A.D.2d 998, 467 N.Y.S.2d 93, 1983 N.Y. App. Div. LEXIS 19610 (1983)............22

*Fifty States Management Corp. v. Pioneer Auto Parks, Inc.,*
    46 N.Y.2d 573, 415 N.Y.S.2d 800, 389 N.E.2d 113 (1979)..................................15

*Gillman v. Chase Manhattan Bank, N.A.,*
    73 N.Y.2d 1 at 10-11; 534 N.E.2d 824, 828; 537 N.Y.S.2d 787 (N.Y. 1988)..............19

*Hull Dye & Paint Works, Inc. v. Riegel Textile Corp.,*
    37 A.D.2d 946 (N.Y. App. Div. 1st Dep't 1971)...............................................14

*Industralease Automated & Scientific Equip. Corp. v. R.M.E. Enterprises,*
    58 A.D. 2d 482, 489, n 4 ......................................................................19, 21

*Master Lease Corp. v. Manhattan Limousine, Ltd.,*
    177 A.D.2d 85, 89 (N.Y. App.Div. 2d Dep't 1992)............................................18

*Matter of State of New York v. Avco Fin. Serv.,*
    50 N.Y. 2d 383, 389..............................................................................18

*Miner v. Walden,*
    101 Misc. 2d 814, 819 (N.Y. Sup. Ct. 1979)....................................................13

*Morrow v. Hallmark Cards, Inc.,*
    273 S.W.3d 15, 23 (Mo. Ct. App. 2008)........................................................13

*Post v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,*
    48 N.Y.2d 84, 397 N.E.2d 358, 359-60, 421 N.Y.S.2d 847 (N.Y. 1979)...................15

*Regeant of Shelby, Inc. v. Leumas Knitting Mills, Inc.,*
    54 A.D.2d 667 (N.Y. App. Div. 1st Dep't 1976)................................................14

*Richardson & Morgan co. v. Gudewill,*
    30 Misc. 818, 61 N.Y.S. 1120, 1899 N.Y. Misc. LEXIS 1103...............................14

*Ryan v. N.Y. Tel. Co.,*
    62 N.Y.2d 494, 501, 467 N.E.2d 487, 478 N.Y.S.2d 823 (1984)...........................6, 7

*Sablosky v. Gordon Co.,*
    73 N.Y.2d 133, 139, 538 N.Y.S.2d 513, 535 N.E.2d 643 (1989)...........................19

*Salazar v. Citadel Commc'ns Corp.,*
    2004 NMSC 13, 135 N.M. 447, 90 P.3d 466 (N.M. 2004)...................................13

## FEDERAL STATUTES

Federal Arbitration Act, 9 U.S.C. § 10(a)(3)...............................................................5

## PRELIMINARY STATEMENT

Defendant's motion to dismiss should be denied because the Financial Industry Regulatory Authority ("FINRA") arbitration provisions specifically exclude class actions like the one which was filed here, and because the contract for repayment of a "forgivable loan" with an acceleration clause for leaving Defendant's employ is nothing more than a disguised non-compete clause, which is unenforceable both as a matter of New York Law and on the facts of this case. For the following reasons, the motion to dismiss must be denied.

## STATEMENT OF FACTS

Plaintiffs Thomas A. Banus, Brent Bishop, Navid Alipour, Anibal Drelichman, Guido Alvarez, and Robert Giusti are each stock brokers formerly employed by Defendant Citigroup Global Markets, Inc. hereinafter "CGMI."[1] At the time they were hired, CGMI, and its parent company, Citigroup, which boasted about how large and stable it was, were considered a reliable and safe company to entrust with large sums of money. The motto of CGMI's wirehouse brokerage house, Smith Barney, was: "We Make Money the Old Fashioned Way: We EARN It." Plaintiffs and other brokers needed that perception of safety and reliability to keep their clients from leaving them and going to another, more stable firm. It would be impossible for any broker to maintain its book of business, and hence his compensation, if the clients all felt that the brokerage firm was unstable financially.

Although the brokers were promised a signing bonus, after they transferred their book of business to CGMI, they were told the bonus would be in the form of a forgivable Promissory Note for a term (in this case seven years)[2] linked to Special Compensation Agreement[3] pre-printed in 9 point type. In some cases, the Promissory Note and Special Compensation

---

[1] See affidavits of Thomas Banus, Brent Bishop and Robert Giusti filed herewith.
[2] See Exhibit A attached to the Declaration of Mark R. Thierman
[3] See Exhibit B attached to the Declaration of Mark R. Thierman.

Agreement were within the stack of papers all new hires are required to sign, such as I-9 forms and W-4 forms. In addition, in the case of Mr. Banus, when he asked about the note, he was told by the branch manager it was merely a formality for tax reasons. Upon information and belief, many (hundreds) of CGMI employees signed identical Promissory Notes linked to identical Special Compensation Agreements, the only differences being the handwritten amount of compensation and the term of the note.

Essentially the note says that CGMI will lend the employee a sum of money, usually a multiple of the employee's book of business expected to come to CGMI, interest free for the term (seven years in this case) but will forgive each year an even amount of the loan (in this case $1/7^{th}$ ) until the loan is zero at the end of its term. The forgiveness is in whole year increments with no partial credit for a partial year of service. The loan has an arbitration clause, but which specifically excludes the employer's right to go to court to obtain an order prohibiting the client from soliciting any of CGMI's clients for a year after leaving, and to return all client records. There is no geographical limitation on this no-solicitation provision.

In addition, the Promissory Note has an acceleration clause that is not triggered upon a default in making payments, but upon the termination of employment with CGMI. The note specifically states that the full sum remaining is due immediately upon the employee leaving CGMI, even if the employee is terminated without just cause. [4] In addition, the Special Compensation Agreement, which is the yearly forgiveness of the loan, requires continued service

---

[4] Paragraph 3 of the Promissory Note states: "Acceleration of Payment. Upon the happening of any of the following events, the Borrower shall be deemed to be in Default of the Note and any outstanding balance due of this Note will become immediately due and payable, together with interest from the date of termination at the rate of prime plus 6% per annum. Default shall mean where the Borrower's employment with Holdings [CGMI], or any subsidiary or affiliate thereof, come to an end for any reason or no reason."

to CGMI[5], but contains no guarantee that CGMI will pay the employee anything else but the loan forgiveness in future years. Of significance, missing an annual payment is not a reason for acceleration of the note. Thus the note is due in full if an employee is terminated, even if the employee tenders the remaining installments in cash at the time of termination, but it is not due if the employee goes on leave of absence (which does not excuse payment) and makes no payment for that year. The note also allows CGMI to attach the broker's personal accounts at CGMI or any other Citigroup affiliate without court order, notice or even an opportunity to be heard.

As everyone knows, the stock market took a tumble from 2006 to 2008, and CGMI's parent company, Citigroup almost became a penny stock as sub-prime mortgage scandals and news of illiquidity became headline news in the financial media. Ultimately, Citigroup had to be rescued by the federal government. As a result of the financial morass at Citigroup, brokers like the Plaintiffs' herein, were unable to honestly assure their clients that the firm that they worked for was solvent, and investors fled from any broker associated with a major wirehouse like CGMI which was known to be holding Collateralized Mortgage Obligations or other paper tied to the housing mortgage market. At the same time, CGMI increased its "grid" or quota for production (the dollar volume of commissions earned from trades) expected of all its stock brokers. With the decrease in the market, the exodus of clients from CGMI and the increase in the grid, brokers like Plaintiffs were working for nothing or next to nothing as their clients all urged them to leave or said they would go elsewhere.

As a result, it became impossible for most brokers to continue to work at CGMI. Many brokers then left CGMI to follow their clients, their only true source of income, to smaller firms who did not foolishly invest in the sub-prime mortgage industry. As the market kept falling,

---

[5] Paragraph 10 of the Special Compensation Agreement also states that the loan forgiveness in paragraph 1 of the "agreement shall cease upon the date of Employees last day of employment, due to any reason or no reason."

3

CGMI abandoned the wirehouse brokerage business altogether, although its signature trademark "Smith Barney" name was merged into Morgan Stanley to become Morgan Stanley Smith Barney. However, Morgan Stanley Smith Barney did not assume the Note, and is therefore not the "Holder" so working for this company does not literally comply with the terms of the agreement.

On August 1, 2009, CGMI initiated arbitration proceedings against Plaintiff Banus. One business day before the arbitration, Plaintiffs' Counsel forwarded the initial complaint in this case to the clerk of this court, who (upon information and belief) received it on or before the date of the hearing. A motion to stay the arbitration pending this case was made, and denied.[6] Since then, some of the other named Plaintiffs have received notices to arbitrate and each has refused to appear pursuant to FINRA Rule 13204(a), which specifically denies the arbitration panel jurisdiction over any putative class action until a court actually denies class certification or the parties consent and agree not to participate in the class action pending. In addition, the FINRA arbitration rules allows the director of FINRA to refuse to arbitrate any dispute he or she feels should not be arbitrated.

The Defendant repeatedly disparagingly refers to Plaintiffs as debtors who are merely seeking to avoid payment. However, this case involves a multi-national conglomerate, Citigroup, which through risky and ill-conceived investments contributed to a crisis of unprecedented proportions in the financial services industry, forcing many of the Plaintiffs and potential Plaintiffs to follow their clients to other firms or face financial ruin. After setting these events in motion, the Defendant now seeks to accelerate a Promissory Note that is an unconscionable contract of adhesion, grossly one-sided and foisted upon parties with little or no

---

[6] A copy of the motion is attached as exhibit C to the declaration of Mark R. Thierman and its arguments are incorporated in this brief as if fully set forth herein.

bargaining power. The note was tailor-made by the Defendant to function as an illegitimate non-compete clause and to shield Citigroup from liability for its own misconduct.  It is believed that the proposed class of individual Plaintiffs includes many for whom the amounts in dispute are insufficient to justify the cost of arbitration or litigation and for this reason Plaintiffs are seeking to aggregate their claims as a class action.

I.     THE ARBITRATION PANEL VIOLATED SECTION 10(A)3 OF THE FEDERAL ARBITRATION ACT BY FAILING TO GRANT A REASONABLE CONTINUANCE TO ALLOW THIS MOTION TO BE DECIDED

The Federal Arbitration Act, 9 U.S.C.§ 10(a)(3)states: "In any of the following cases the United States court in and for the district wherein the award was made may make an order vacating the award upon the application of any party to the arbitration . . .where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown. . ."  In this case, Plaintiff's Counsel asked for a few months stay based upon FINRA Rule 13204 until this Court could decide if the case was going to go forward as a class, and if it was going to grant Defendant's motion to dismiss.  This is a reasonable request because to participate in the arbitration would be tantamount to Plaintiff waiving its right to petition the Court for a determination of arbitrability. This is a Hobson choice for a Plaintiff, because it must forgo any argument on the merits until after a Court has ruled on the issue of arbitrability, basically insuring that unless the Court decides the case is not subject to arbitration, Plaintiff has lost on the merits without a fair hearing.  On the other hand, a few months delay could not possibly prejudice the Defendant since a petition to review would automatically stay enforcement anyway under FINRA's rules. This was explained to the panel but the panel, without stating any reason, decided not to grant the stay.

With Defendant having nothing to lose, and with Plaintiff having everything to lose, the denial of the stay constitutes misconduct that is sufficient to set aside the award.

And now, predictably, Defendant comes forward to argue that Plaintiffs are barred by the doctrines of *Res Judicata* and *Collateral Estoppel* from asserting a claim in federal court. However, Defendant failed to disclose to this Court the existence of FINRA arbitration awards, perhaps hundreds of awards, that are adverse to Defendant's position, and which find that CGMI did not perform its side of the bargain with respect to the Promissory Note and Special Compensation Agreement.[7]  Plaintiff concurs with Defendant to the extent that the doctrines of *Res Judicata* and *Collateral Estoppel* should be binding only to the extent that Defendant CGMI should be precluded by arbitration rulings that are adverse to Defendant's position from seeking to enforce the Promissory Note and Special Compensation Agreement against Mr. Banus and other existing or potential Plaintiffs.

In any case, Defendant concedes that collateral estoppel is appropriate against Plaintiffs only if Plaintiffs had a "full and fair opportunity" in the prior proceeding to contest the ruling now said to be controlling. See *Defendants Memorandum of Law In Support of Motion To Dismiss Plaintiffs' Second Amended Complaint* at 11.  Defendants refer to the case of Ryan v. N.Y. Tel. Co., 62 N.Y.2d 494, 501, 467 N.E.2d 487, 478 N.Y.S.2d 823 (1984), wherein a telephone worker who was fired and charged with theft  voluntarily appeared before an administrative tribunal deciding his unemployment compensation claim. In that case, the Court said Ryan had a full and fair hearing, noting that "the hearing was initiated by Ryan himself to determine his entitlement to unemployment benefits ... ."  Ryan

---

[7] See Plaintiff's Motion under Rule 56(f), which includes evidence that Defendant has failed to disclose to the Court that FINRA arbitration awards uniformly go against Defendant CGMI, holding CGMI did not perform its side of the bargain with respect to the Promissory Note and Special Compensation that the notes are unconscionable, and/or the amount owed by the signer is not due.

at 7. In this case, Plaintiff's Counsel specifically asked the arbitration panel for a stay

pursuant to a FINRA Rule 13204, which clearly states that class action claims may NOT be

arbitrated by the panel under the Code. At best, Plaintiff's Counsel was a reluctant participant

in Mr. Banus' arbitration hearing. Plaintiff's Counsel appeared in subsequent hearings

involving other Plaintiffs only for the purpose of registering Plaintiff's objection to the

proceedings.

The Court in Ryan discusses several factors relevant to the issue of whether a party has

received a "full and fair" hearing sufficient to justify invoking the Doctrine of Collateral

Estoppel. These factors include: the nature of the forum (in this case, inappropriate for

class action claims) and the importance of the claim in the prior litigation, the incentive and

initiative to litigate (Plaintiff objected but was forced to proceed before the arbitration panel)

and the actual extent of litigation, and differences in the applicable law and the forseeability

of future litigation. Ryan at 6. Whether Plaintiff received a "full and fair hearing" before

the arbitration panel is very much at issue in this case. Plaintiff's Counsel attended Mr.

Banus' hearing with the reasonable expectation that he would be granted a short stay from

the arbitration panel pursuant to the clear parameters of FINRA Rule 13204. The panel's

insistence upon proceeding in light of FINRA Rule 13204 was unfair to Mr. Banus. In

addition, the Court in Ryan states, "[W]here the party against whom collateral estoppel is

asserted claims that he was not offered a full and fair opportunity in the prior administrative

proceeding to contest the decision now said to be controlling, he must be allowed to do so."

Ryan at 4.

According to the Ryan Court, the burden rests upon the proponent of collateral estoppel

to demonstrate the "identicality and decisiveness" of the issue decided by the prior tribunal.

Ryan at 4. The Ryan Court compared the "material issues" raised in the pending appeal with

those resolved in the prior administrative hearing and also examined the prior proceeding itself to ascertain the identity and decisiveness of the issues. Ryan at 6. Here, Defendants seeks to meet its burden with vague assertions that Plaintiffs "lost" after "two" hearings before the arbitration panel. See *Defendant's Memorandum of Law in Support of Motion to Dismiss* at 12. In fact, Plaintiff's Counsel attended the second and subsequent arbitration hearings only to register an objection to the proceedings. The Defendant has failed to meet its burden.

Finally, unlike the administrative panel in this case, the Ryan case involved a quasi-judicial administrative panel that derives its legitimacy from state law. FINRA is a private independent organization formed in 2007 by the industry and it operates according to its own standards, rules and regulations.[8] This case involves a single unexplained decision by a FINRA panel that runs contrary to FINRA's own Rule 13204 and which was made over the objections of Plaintiff's Counsel. This decision was made in the context of a particular case involving a unique set of facts pertaining to Mr. Banus. And now the Defendant argues that this panel's decision should not only preclude the U.S. District Court from considering the claims of Mr. Banus but also the claims of an entire class of existing and potential future Plaintiffs who happen to be represented by Plaintiff's Counsel. This is both overbroad and unfair to Plaintiffs who have not yet had their day in "court."

With respect to the issue of privity, Defendants refer to Alpert's Newspaper Delivering Inc. v. New York Times Co., 8756 F. 2d 266, 270 (2d Cir. 1989), where the Court found that an association of newspaper deliverers, Metropolitan Routedealers Association (MRA), was the "admitted mastermind of the prior litigation and provided similar tactical and financial help in the present case." Id. at 4. In Alperts, Metropolitan Routedealers had

---

[8] *See* http://www.finra.org/AboutFINRA/index.htm

been amassing legal funds to challenge the Times for almost a decade, supported two

lawsuits, and was helping to pay Counsel's salary in the instant case. In fact, the Court said

that Metropolitan Routedealers could be fairly characterized to be a party in the case. <u>Alperts</u>

at 3. Plaintiff's Counsel submits that the Defendant's analysis is not only inapplicable in this

case but is so overbroad that it would potentially apply to any case in which one counsel

represents more than one client, resulting in an absurd outcome.


II.    THE FINRA ARBITRATION IS UNENFORCABLE UNDER THE SECOND
       CIRCUIT CASE OF *ITALIAN COLORS REST. v. AM. EXPRESS TRAVEL
       RELATED SERVS. CO.* (IN RE AM. EXPRESS MERCHANTS' LITIG.), 554 F.3D
       300 (2D CIR. N.Y. 2009) BECAUSE FINRA RULE 13204 IS A CLASS ACTION
       WAIVER PROVISION

Defendant's primary argument in support of its motion to dismiss, that the issue is somehow

precluded by the FINRA arbitration agreement, is totally flawed because the FINRA arbitration

agreement contains a class action waiver provision, and it was this very provision which the

Plaintiffs challenged (or will challenge in future cases). FINRA Rule 13204 explicitly states:

> (a) Class action claims may not be arbitrated under the Code.
>
> (b) Any claim that is based upon the same facts and law, and involves the
> same defendants as in a court-certified class action or a putative class
> action, or that is ordered by a court for class-wide arbitration at a forum
> not sponsored by a self-regulatory organization, shall not be arbitrated
> under the Code, unless the party bringing the claim files with FINRA one
> of the following:
>
>> (1) a copy of a notice filed with the court in which the class action
>> is pending that the party will not participate in the class action or in
>> any recovery that may result from the class action, or has
>> withdrawn from the class according to any conditions set by the
>> court; or
>>
>> (2) a notice that the party will not participate in the class action or
>> in any recovery that may result from the class action.

9

(c) The Director will refer to a panel any dispute as to whether a claim is part of a class action, unless a party asks the court hearing the class action to resolve the dispute within 10 days of receiving notice that the Director has decided to refer the dispute to a panel.

(d) A member or associated person may not enforce any arbitration agreement against a member of a certified or putative class action with respect to any claim that is the subject of the certified or putative class action until:

• The class certification is denied;

• The class is decertified;

• The member of the certified or putative class is excluded from the class by the court; or

• The member of the certified or putative class elects not to participate in the class or withdraws from the class according to conditions set by the court, if any.

This paragraph does not otherwise affect the enforceability of any rights under the Code or any other agreement.

In effect, Rule 13204 says the parties must waive their rights to participate in a putative class action as a prerequisite to FINRA arbitrators taking jurisdiction over the case, unless a court has already declared that the class will not be certified. Like many other courts, the United States Court of Appeals for the Second Circuit has declared in the case of Italian Colors Rest. v. Am. Express Travel Related Servs. Co. (In Re Am. Express Merchants' Litig., 554 F.3D 300 (2d Cir. N.Y. 2009, that such class action waivers are unenforceable, and the arbitration agreement unconscionable under the federal common law interpreting Section 2 of the Federal Arbitration Act in cases like this one. "We join other Circuits that have evaluated arbitration clauses containing class action waivers under the federal substantive law of arbitrability." Id. As stated in Re. American Express Merchants' Litig.:

We therefore hold that the class action waiver in the Card Acceptance Agreement cannot be enforced in this case because to do so would grant Amex de facto immunity from antitrust liability by removing the plaintiffs'

> only reasonably feasible means of recovery. As already set forth, Section 2
> of the FAA, 9 U.S.C. § 2, provides that an agreement to arbitrate "shall be
> valid, irrevocable, and enforceable, save upon such grounds as exist at law
> or in equity for the revocation of any contract." Given that we believe that
> a valid ground exists for the revocation of the class action waiver, it
> cannot be enforced under the FAA.

Here a "small" Plaintiff (in this case an individual) is battling with a large Defendant (in this case the NYSE company of CGMI), over an issue of public policy (overbroad non-compete clauses and loan acceleration clauses) for a relatively small amount (Mr. Banus owes only $45,675.36, as compared to an estimated more than a hundred thousand dollars to litigate the matter to completion.)  In Re Am. Express Merchants' Litig., the Court states:

> [T]he enforceability of a particular class action waiver in an arbitration
> agreement must be determined on a case-by-case basis, considering the
> totality of the facts and circumstances. Relevant circumstances may
> include, but are not limited to, the fairness of the provisions, the cost to an
> individual plaintiff of vindicating the claim when compared to the
> plaintiff's potential recovery, the ability to recover attorneys' fees and
> other costs and thus obtain legal representation to prosecute the underlying
> claim, the practical affect the waiver will have on a company's ability to
> engage in unchecked market behavior, and related public policy concerns.

In Re Am. Express Merchants' Litig. also disposes of the Defendant's procedural argument that the Plaintiffs waived the issue by not seeking a court order to enjoin the arbitration.  In that case, the Court of Appeals for the Second Circuit confirmed that a "challenge . . . to the arbitration clause itself," rather than to the substantive terms of the Agreement, involves "a gateway dispute about whether the parties are bound by a given arbitration clause," a dispute which "raises a question of arbitrability for a court to decide." The Court was quoting from Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79, 84 (2002) , which was a case under the NSAD arbitration rules, where the brokerage firm challenged the ability of the arbitrator to decide the issue because of the passage of time and a statute of limitations. In that case, the U.S. Supreme Court said a "question of arbitrability" is for a court to decide. See First Options v.

11

Kaplan, 514 U.S. 938 at 943-946 (U.S. 1995) (holding that a court should decide whether the arbitration contract bound parties who did not sign the agreement); _John Wiley & Sons, Inc. v. Livingston_, 376 U.S. 543, 546-547, (1964) (holding that a court should decide whether an arbitration agreement survived a corporate merger and bound the resulting corporation). Similarly, a disagreement about whether an arbitration clause in a concededly binding contract applies to a particular type of controversy is for the court. See, e.g., AT&T Techs. v. Communications Workers of Am., 475 U.S. 643 at 651-652 (U.S. 1986) (holding that a court should decide whether a labor-management layoff controversy falls within the arbitration clause of a collective-bargaining agreement); Atkinson v. Sinclair Refining Co., 370 U.S. 238, 241-243, (1962) (holding that a court should decide whether a clause providing for arbitration of various "grievances" covers claims for damages for breach of a no-strike agreement).

    To the extent it denies access to the courts to contest the arbitrability of a dispute, FINRA Rule 13204(c) is unconscionable, and inconsistent with FINRA Rule 13204(d). The Plaintiffs never consented to having the issue decided by the arbitration panel. In the case of Mr. Banus, Plaintiff's Counsel initially objected to the proceedings and participated only reluctantly. It is for the Court to consider any challenge to the arbitrability of the dispute, and any restriction on bringing that dispute to the court would be beyond the jurisdiction of the arbitration process. Buckeye Check Cashing, Inc. v. Cardegna, 546 U.S. 440, 444 (2006), held that if there is a challenge to "'the arbitration clause itself -- an issue which goes to the making of the agreement to arbitrate -- the federal court may proceed to adjudicate it (_quoting_ Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395, 403-404, (1967)); Accord Kristian v. Comcast Corp., 446 F.3d 25, 55 (1 Cir. 2006); Jenkins v. First Am. Cash Advance of Georgia, LLC, 400 F.3d 868, 877 (11 Cir. 2005). Indeed, Paragraph 9 of the Special Compensation Agreement says that the employee consents to the jurisdiction of the courts of New York for any action to compel

arbitration, which implies that if the Employee refuses to submit a dispute to arbitration, then the

Employer must seek an order to compel.  It does not reserve jurisdiction to the arbitrator to

decide their own jurisdiction to arbitrate. See, *e.g.* Alternative Systems, Inc. v. Carey, 67

Cal.App.4th 1034, 1040–1041, 79 Cal. Rptr. 2d 567 (1998) (Objection to arbitrability preserved

where a party "did not participate at all except to object.").

In addition, the arbitration agreement is unconscionable because it allows the employer to

pick and choose which disputes it will arbitrate, one-way arbitration.  One-way arbitrations are

per se unconscionable.  Kaneff v. Del. Title Loans, Inc., 587 F.3d 616 (3d Cir. 2009).  A "non-

mutual" arbitration provision is unconscionable. See Triarch Indus. v. Crabtree, 158 S.W.3d at

775; *see also*, Ting v. AT&T, 319 F.3d 1126, 1149-51 (9th Cir. 2003);  Morrow v. Hallmark

Cards, Inc., 273 S.W.3d 15, 23 (Mo. Ct. App. 2008);  Gibson v. Neighborhood Health Clinics,

Inc., 121 F.3d 1126 (7th Cir. 1997) (employer required employee to arbitrate, but employer did

not agree to submit its claims to arbitration); Salazar v. Citadel Commc'ns Corp., 2004 NMSC

13, 135 N.M. 447, 90 P.3d 466 (N.M. 2004) (employee supposedly obligated to arbitrate, but

employer not obligated to do so; arbitration agreement held illusory); Dumais v. Am. Golf Corp.,

299 F.3d 1216 (10th Cir. 2002) (the "We Can Work It Out" agreement required the employee to

arbitrate, but left the employer free to revoke or alter the arbitration plan; held not enforceable

arbitration contract).

In this case, the Special Compensation Agreement provides that the employer may forego

arbitration and go directly to court to enforce its one year covenant not to compete.  But the

employee may not sue in court, even for declaratory relief on the same issue.  An arbitration

agreement will not be enforced unless it is "mutually binding."  Miner v. Walden, 101 Misc. 2d

814, 819 (N.Y. Sup. Ct. 1979); see also  Regeant of Shelby, Inc. v. Leumas Knitting Mills, Inc.,

54 A.D.2d 667 (N.Y. App. Div. 1st Dep't 1976), Hull Dye & Print Works, Inc. v. Riegel Textile

Corp., 37 A.D.2d 946 (N.Y. App. Div. 1st Dep't 1971).

FINRA Rule 13200(b) says insurance companies don't have to arbitrate, just because they

are insurance companies even if they are employing brokers to sell products, but brokers must.

And under FINRA Rule 13203, some disputes (to be named later) are not arbitrable, and the

claimant (in this case, the employer CGMI), can pick the forum:

> (a) The Director may decline to permit the use of the FINRA arbitration
> forum if the Director determines that, given the purposes of FINRA and
> the intent of the Code, the subject matter of the dispute is inappropriate, or
> that accepting the matter would pose a risk to the health or safety of
> arbitrators, staff, or parties or their representatives. Only the Director or
> the President of FINRA Dispute Resolution may exercise the Director's
> authority under this rule.
> (b) Disputes that arise out of transactions in a readily identifiable market
> may be referred to the arbitration forum for that market, if the claimant
> agrees.

III.    UNDER NEW YORK'S EMPLOYEE CHOICE DOCTRINE, DEFENDANT'S
        NON-COMPETITION AGREEMENT IS UNCONSCIONABLE AND
        UNENFORCEABLE COVENANT NOT TO COMPETE

The substantive provisions of the Promissory Note involved in this case are governed by

New York law. As stated in Paragraph 12 of the Promissory Note: "Governing Law. This Note

and the loan evidenced thereby shall be governed by the laws of the State of New York." Under

New York law, the note and employment agreement constitute a single contract, and all contract

defenses apply to the note as well, and the two instruments are to be considered as one.

Richardson & Morgan Co. v. Gudewill, 30 Misc. 818,  61 N.Y.S. 1120, 1899 N.Y. Misc. LEXIS

1103 ("The note was given in pursuance of the contract for the exact sum therein stipulated, and,

if plaintiff failed to perform its part of the contract, it goes to the failure of the consideration of

the note.") See also, *Internal Revenue Service Technical Advise Memorandum 20004004* of

March 17, 2000 holding that Taxpayer's payments to participating employees pursuant to a

14

"Promissory Note and Pledge Agreement" and a "Bonus Agreement" constitutes present compensation for future services rather than the proceeds of a bona fide loan. Taken together, the Promissory Note and Supplemental Compensation Agreement are really a signing bonus coupled with a covenant not to compete for the length of the note (in this case seven years) and with no industry (stock brokerage) or geographical restrictions. As a covenant not to compete, it is overbroad and unenforceable.

The note provides that if the Plaintiff is terminated from employment, for cause or for no cause, the note accelerates. There is no other reason to accelerate payment in this contract, not even failure to make payments according to the terms. This acceleration clause is void because it is a penalty which occurs at the time of leaving rather than the missing of an installment payment. See Fifty States Management Corp. v. Pioneer Auto Parks, Inc., 46 N.Y.2d 573, 415 N.Y.S.2d 800, 389 N.E.2d 113 (1979) and Walter E. Heller & Co. v. Video Innovations, Inc., 730 F.2d 50, 54 (2d Cir. N.Y. 1984).

Unlike a lease or normal loan, the acceleration is triggered by the loss of employment rather than the failure to make a periodic payment. This is a punishment for leaving early that has no legitimate business purpose. If the Defendant wanted to be paid as soon as a default occurred, the default would be defined as failure to make a payment, or failure to have resources to pay the note, and not just terminating employment from this one employer. As stated by the Court of Appeals in Lucente v. IBM, 310 F.3d 243 at 254 (2d Cir. N.Y. 2002): "New York courts disfavor restrictive covenants in the employment context and will generally enforce them only to the extent they are reasonable and necessary to protect valid business interests." citing BDO Seidman v. Hirshberg, 93 N.Y.2d 382, 712 N.E.2d 1220, 1222-23, 690 N.Y.S.2d 854 (N.Y. 1999); Post v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 48 N.Y.2d 84, 397 N.E.2d 358, 359-60, 421 N.Y.S.2d 847 (N.Y. 1979)). A non-compete clause that is not geographically limited or

limited in time is per se overbroad. As stated in <u>GFI Brokers, LLC v. Santana</u>, 2008 U.S. Dist.

LEXIS 59219 (S.D.N.Y. Aug. 6, 2008)

> The enforceability of covenants not to compete is "rigorously examined"
> because of "the general public policy favoring robust and uninhibited
> competition" and the "powerful considerations of public policy which
> militate against sanctioning the loss of a man's livelihood." <u>American
> Institute of Chemical Engineers v. Reber-Friel Co.</u>, 682 F.2d 382, 387 (2d
> Cir. 1982). To be enforceable, covenants must be "reasonable" in terms of
> both time and geographic area, and they must be "necessary" to protect the
> legitimate interests of an employer against unfair competition.

Taken together, the Promissory Note and Supplemental Compensation Agreement is just a

signing bonus linked to a seven year, unlimited non-compete agreement. Unless a specific

exception applies, a non-competition agreement must be narrowly construed and must contain

time, geographic and/or industry limitations. <u>A.N. Deringer, Inc. v. Strough</u>, 103 F.3d 243 (2d

Cir. 1996). In this case, the acceleration clause would apply even if the stock broker left New

York to work as an accountant in a steel mill in Pennsylvania. There is no time or geographic

restriction. <u>Ticor Title Ins. Co. v. Cohen</u>, 173 F.3d 63, 69-70 (2d Cir. 1999). The loan is due and

payable the moment the employee quits. If this is a restriction on competition, it is overbroad. If

it is truly just a note, then the only legitimate business interest of the parties is to make sure the

Defendant CGMI gets paid back its note, in the time it would have taken to pay it back. As long

as the employee is making the yearly payments, just as if he was working for the Defendant, and

can give reasonable assurances of future abilities to pay back the loan, i.e. like working for a

competitor doing the same job he did for Defendant, then there is no business justification for the

acceleration provision. The acceleration clause is designed to be a penalty for leaving the

employer's employ. At the very least, this presents a question of fact for trial.

Under New York law, the employee choice doctrine is the only exception that allows per se

enforcement of a covenant not to compete. But if the employer can't fulfill the standards of this

test, which it cannot in this case, then the reasonableness of the covenant not to compete is a question of fact for trial, and not susceptible to a motion for summary judgment or judgment on the pleadings. As the Court stated in <u>Morris v. Schroder Capital Mgmt. Int'l</u>, 445 F.3d 525 (2d Cir. 2006), even though the New York courts have not sketched out every detail of the employee choice doctrine, the following three elements are "bold and clear":

> First, an employer can rely on the doctrine only if it can demonstrate its continued willingness to employ the party who covenanted not to compete. Second, when an employee is involuntarily discharged without cause, the employer cannot invoke the benefits of the doctrine. Enforcing the non-competition provision under such circumstances would be "unconscionable" because it would destroy the mutuality of obligation on which a covenant not to compete is based. Third, the factual determination whether an employee was involuntarily terminated is generally not appropriate for summary judgment.

Of course CGMI can't offer the employees their job back in this case because it is no longer in the business of retail brokerage. Instead, it makes noises about another entity, Morgan Stanley Smith Barney, which is not the "holder" of the note, so employment with Morgan Stanley Smith Barney does not prevent acceleration of the note. If Morgan Stanly Smith Barney was assigned the note, then maybe Morgan Stanley Smith Barney could enforce it but that is not the case here. Employees are not like slaves who can be traded or bartered with the sale of a business.

The Defendant fails all three prongs of the test. First, Morgan Stanley Smith Barney isn't the Defendant here, because it wasn't assigned the note. And CGMI has no "willingness to employ the party who covenanted not to compete." Also, the note says the acceleration clause applies even when the employer, CGMI, discharges an employee without cause. This fails the second prong of the test above. <u>Morris v. Schroder Capital Mgmt. Int'l</u>, 445 F.3d 525 (2d Cir. 2006), says there must be mutuality to enforce any covenant to compete in New York. And third, all the employees who left CGMI state that they did so only because CGMI forced them out by becoming so unstable that their clients, and hence their income, was leaving or about to leave,

and they would be working for nothing or less if they stayed.  This is a form of constructive

discharge, and is "generally not appropriate for summary judgment".   CGMI fails all three tests

of the employee choice exception to overbroad non-competition clauses being unenforceable.

IV.    THE PROMMISORY NOTE WAS A CONTRACT OF ADHESION AND
        UNCONSCIONABLE AS A MATTER OF LAW

Federal Arbitration Act § 2 requires Courts to enforce arbitration proceedings "save upon

such grounds as exist at law or in equity for the revocation of any contract."[9] This "savings

clause" holds that generally applicable defenses such as unconscionability may be applied to

invalidate arbitration agreements without contravening the FAA.[10] The U.S. Supreme Court has

ruled that states must place arbitration provisions "upon the same footing as other contracts."  [11]

In this case, the Promissory Note is both procedurally and substantively unconscionable.

"As a general proposition, unconscionability, a flexible doctrine with roots in equity …

requires some showing of 'an absence of meaningful choice on the part of one of the parties

together with contract terms which are unreasonably favorable to the other party.'" (Master

Lease Corp. v. Manhattan Limousine, Ltd., 177 A.D.2d 85, 89 (N.Y. App. Div. 2d Dep't 1992)

citing Matter of State of New York v Avco Fin. Serv., 50 NY2d 383, 389, and quoting from

Williams v Walker-Thomas Furniture Co., 350 F2d 445, 449). This definition reveals two major

elements that are labeled "procedural" and "substantive" unconscionability by commentators

(see, e.g. Leff, A.A., Unconscionability *and the Code--The Emperor's New Clause*, 115 U Pa L

Rev 485 (1967)). The procedural element of unconscionability concerns the contract formation

process and the alleged lack of meaningful choice; the substantive element looks to the content

---

[9] 9 U.S.C. § 2 (1994)

[10] Doctors's Assocs. Inc. v. Casarotto, 517 U.S. 681, 687 (196); see also, Allied-Bruce Terminus
Cos. v. Dobson, 513 U.S. 265, 281 (1996(; Rodriguez de Quijas v. Shearson/Am Express, Inc.,
490 U.S. 477, 483-484 (1989); Shearson/Am Express, Inc. v. McMahon, 482 U.S. 220, 226
(1987).

[11] Scherk v. Alberto-Culver Co. 417 U.S. 506, 511 (1974).

of the contract, per se ( Industralease Automated & Scientific Equip. Corp. v R.M.E. Enterprises, 58 A.D.2d 482, 489, n 4 [Hopkins, J.]). Examples of the former include, but are certainly not limited to, high pressure commercial tactics, inequality of bargaining power, deceptive practices and language in the contract, and an imbalance in the understanding and acumen of the parties. Examples of unreasonably favorable contractual provisions are virtually limitless but include inflated prices, unfair termination clauses, unfair limitations on consequential damages and improper disclaimers of warranty. Id.

In this case, it was standard practice for Defendant to present the Promissory Note as a bait and switch from the promised sign-on bonus after the new employee had already left his former position and convinced his clients to come to CGMI. As the Court can see, the type size on the Promissory Note is so small that its terms are practical illegible. And at the time the note was presented to the broker, the broker was so rushed that no meaningful negotiation took place. While inequality in bargaining power between employers and employees is not alone sufficient to hold agreements unenforceable (see Sablosky v. Gordon Co., 73 N.Y.2d 133, 139, 538 N.Y.S.2d 513, 535 N.E.2d 643 (1989)) such inequality, when coupled with high pressure tactics that coerce an employee's acceptance of onerous terms, may be sufficient to show that an employee lacked a meaningful choice. Brennan v. Bally Total Fitness, 198 F. Supp. 2d 377, 382 (S.D.N.Y. 2002).

To determine whether a contract was validly formed, a court should focus on evidence of high pressure or deceptive tactics, the use of fine print in the contract, and any disparity in experience and education, i.e. bargaining power, between the parties. See Wright v. SFX Entertainment, Inc., 2001 U.S. Dist. LEXIS 1000, 2001 WL 103433, at *3; Gillman v. Chase Manhattan Bank, N.A., 73 N.Y.2d 1 at 10-11; 534 N.E.2d 824, 828; 537 N.Y.S.2d 787 (N.Y. 1988); see also Klos v. Lotnicze, 133 F.3d 164, 168 (2d Cir. 1997)("Typical contracts of

19

adhesion are standard-form contracts offered by large, economically powerful corporations to

unrepresented, uneducated, and needy individuals on a take-it-or-leave-it basis with no

opportunity to change the terms."); Brower v. Gateway, 2000, 246 A.D.2d 246, 676 N.Y.S.2d

569, 573 (1st Dep't 1998)(describing disparity in bargaining power as turning on the "experience

and education of the party claiming unconscionability."). In this case, the Promissory Note is a

pre-printed form, a classic take it or leave it proposition, with the broker having no bargaining

power to change its terms. Te brokers need the money to sustain themselves and their families

until their own production generates commission revenue. The Promissory Note was presented

to the broker in a stack of new hire paperwork only after the broker left his or her former

employer. At that point, the broker could not tell his clients to move their accounts again. And

since the broker's compensation is always tied to his or her "production" the broker had no

choice but to sign the Promissory Note.

Not only was the formation defective, which is procedural unconscionability, but the terms of

the note are grossly one-sided, which is substantive unconscionability. For example, the note an

overbroad and onerous one-way attorneys fee clause; Paragraph 6 says the employee must pay

all costs of collections, including CGMI's attorney fees. When Courts examine a contract

provision for substantive unconscionablity, they typically focus on the "oppressiveness" or

"gross one-sidedness" of the contract terms.[12] In this case, the contract unfairly allocates the risk

to the signer. Like the contract found unconscionable in Brennan v. Bally Total Fitness, 198 F.

Supp. 2d 377, 384 (S.D.N.Y. 2002), the Promissory Note and special supplemental bonus bind

the employee to a contract that they have never seen, in this case by conditioning the forgiveness

---

[12] See e.g., RESTATEMENT (SECOND) OF CONTRACTS § 208 cmt. d (1981). ) ("[G]ross
inequality of bargaining power, together with terms unreasonably favorable to the stronger party,
may confirm indications that the transaction involved elements of deception or compulsion, or
may show that the weaker party had no meaningful choice, no real alternative, or did not in fact
assent or appear to assent to the unfair terms.")

and non-acceleration on the employee's working for the employer on any terms the employer may choose to impose. Unconscionable contracts are characterized by an absence of meaningful choice on the part of one of the contracting parties, together with contract terms unreasonably favorable to the other party. See generally *Blake v. Biscardi*, 62 A.D.2d 975, 403 N.Y.S.2d 544, 546-47 (2d Dept. 1978), quoting Williams v. Walker-Thomas Furniture Co., 121 U.S. App. D.C. 315, 350 F.2d 445, 449-50 (D.C.Cir.1965) and Industralease Automated & Scientific Equip. Corp. v. R.M.E. Enterprises, 58 A.D.2d 482, 396 N.Y.S.2d 427, 431-32 (2d Dept. 1977). In many instances meaningful choice is negated by a gross disparity in the bargaining power of the contracting parties. The court should consider the experience and education of the party claiming the contract to be unconscionable as well as the commercial setting surrounding the transaction. Blake v. Biscardi, 403 N.Y.S.2d 544 at 547 (N.Y. App. Div. 2d Dep't 1978); Industralease Automated & Scientific Equip. Corp. v. R.M.E. Enters., Inc., 58 A.D.2d 482, 396 N.Y.S.2d 427 at 431-432 (App. Div. 1977); Williams v. Walker-Thomas Furniture Co., 350 F.2d 445 (D.C. Cir. 1965).

V.    THE ACCELERATION CLAUSE IS INVALID BECAUSE OF FUSTRATION OF PURPOSE

The Restatement (Second) of Contracts § 265 (1981), provides: "Where, after a contract is made, a party's principal purpose is substantially frustrated without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his remaining duties to render performance are discharged, unless the language or the circumstances indicate to the contrary. In In re Stock Exchs. Options Trading Antitrust Litig., 2005 U.S. Dist. LEXIS 13734 (S.D.N.Y. 2005), the party asserting frustration of purpose must show: 1. the party's principal purpose in making the contract is frustrated; 2. without that party's fault; 3. by the occurrence of an event, the non-occurrence of which was a basic assumption on

21

which the contract was made. Here, the purpose of the brokers joining CGMI was to sell stock in

an environment that would allow them to assure their clients that it was safe and stable. Smith

Barney had a reputation and represented itself to be a large, stable and conservatively run

financial institution that would attract new investors and safeguard existing clients' funds. The

brokers had no way of anticipating at that time that Citigroup was conducting its business in such

a way that it would be perceived in the media to be an unsafe place for investors to park their

money. When media reports surfaced about Citigroup's difficulties, clients panicked, demanded

that their money be moved to a more stable institution, and brokers were unable to recruit new

clients, resulting in a dramatic loss of future commissions[13] and putting their own economic

survival at risk. Brokers were forced to discontinue their employment at Citigroup because

Citigroup created a crisis of confidence in its handling of clients' funds that frustrated the

broker's principal purpose for making the contract, to serve existing clients and recruit new

clients.

Would a reasonable person have signed a contract like the one in question here if he or

she had known of Citigroup's risky practices? The Court in City of New York, Respondent, v.

Long Island Airports Limousine Service Corporation et al., 96 A.D.2d 998, 467 N.Y.S.2d 93,

1983 N.Y. App. Div. LEXIS 19610 (1983), considered the enforceability of a franchise contract

between a transportation company and the City of New York which allowed the company to

transport passengers to and from the airport. At the time of the contract, the City's consent

to operate the transportation route was required by statute; however, the law was amended such

---

[13]*See* affidavit of Robert Giusti, who says that he worked literally for years to recruit as a client
an accountant with control of assets of over $100 million, which would have netted the broker an
estimated $1.5 million in annual commissions. After negative publicity about Citigroup, Mr.
Giusti says the accountant told him that if he invested his clients' money at Citigroup he would
lose the credibility of his clients and would possibly be liable for breaching his fiduciary duty to
his clients.

that the City's consent was no longer necessary. Id. at 94. The franchise contract required the

company to pay compensation to the City in exchange for its consent to operate the route even

after the City's consent was not required. Id. The court held that the company's payment

obligation was discharged because the purpose of the contract had been frustrated:

> The only possible reason for the franchise contract . . . was that the city's consent was
> required by statute before [the defendant company] was entitled to operate its omnibus route .
> . . . The statutory changes have made the contract worthless to [the defendant] and also made
> performance of the contract vastly different from what could reasonably have been within the
> contemplation of the parties when the contract was made. Given these altered circumstances,
> it is clear that reasonable men would not have made the subject contract, and that the contract
> has been rendered worthless to [the defendant]. Therefore, the consideration supporting the
> contract has failed, and [the defendant's] performance thereof is excused. Id.

In this case, it is not reasonable to expect that a broker could foresee that Citigroup, a

reputable international financial conglomerate, was engaging in unwise investment strategies to

the extent that Citigroup would need a government bailout to survive.    Indeed, according to

media reports, this revelation came as a shock to regulatory authorities, politicians and to society

in general. The performance of the contract was vastly different from what could reasonably

have been within the contemplation of the brokers when the contract was made. If the true state

of Citigroup's operations was known, no reasonable broker would have signed the Promissory

Note or the Special Compensation Agreement. The Court must conclude that the contracts in

question are rendered worthless.

/ / /

## CONCLUSION

For all of the foregoing reasons, Plaintiff respectfully asks the Court to dismiss CGMI's

Motion to Dismiss Plaintiffs' Second Amended Complaint.


Dated: Reno, NV                                    Respectfully submitted,
February 15, 2010

                                                   Theirman Law Firm
                                                   7287 Lakeside Drive
                                                   Reno, NV 89511
                                                   775.284.1500


                                        By: ___/s/Mark R. Thierman_____

                                                   Mark R. Thierman, J.D.
                                                   Plaintiffs' Attorney
                                                   Pro Hac Vice

24